UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

PATRICIA M. BRYANT,           )
                              )
              Plaintiff       )
                              )
         v.                   )   CIVIL NO. 4:08 cv 75
                              )
MICHAEL J. ASTRUE, Commissioner,)
Social Security Administration, )
                              )
              Defendant       )

OPINION AND ORDER

This matter is before the court on the Complaint [DE 1]
filed on September 29, 2008, by Patricia M. Bryant, seeking
reversal or remand of the decision of the Social Security Admin-
istration denying her claim for Title II Disability Insurance
Benefits ("DIB") and Title XVI Supplemental Security Income
("SSI") Benefits.  For the following reasons, the court **DENIES**
Bryant's request, thereby **AFFIRMING** the decision of the Social
Security Administration.

Background

On January 28, 2005, Bryant filed concurrent applications
for DIB and SSI, alleging an onset date of September 17, 2004.
(Tr. 61)  The applications were denied initially on March 7,
2005, and upon reconsideration on July 22, 2005.  (Tr. 33-35, 39-
43)  A timely Request for Hearing was filed on September 2, 2005.
(Tr. 32)  A video hearing was held in Danville, Illinois on
November 5, 2007, before Administrative Law Judge E. James Gildea
who was presiding over the case from Chicago, Illinois.  (Tr.

460, 462)  Present at the hearing were Bryant, her attorney, Todd
Lichtenberger, and Dr. James Lanier, a vocational expert.  (Tr.
460)  On January 24, 2008, ALJ Gildea denied Bryant's applica-
tions and claims for benefits.  (Tr. 13-24)  Bryant timely filed
a Request for Review of the decision with the Appeals Council on
March 4, 2008, and submitted a memorandum in support.  (Tr. 10-
11)  On June 17, 2008, the Appeals Council denied review, making
the ALJ's decision the final decision of the Commissioner.  (Tr.
7-10); 20 C.F.R. §404.981.  After a timely extension was granted
by the Appeals Council, Bryant filed her Complaint pursuant to 42
U.S.C. §405(g) on September 29, 2008.

Bryant was born on September 17, 1960, was exactly 44 years
old on the alleged disability onset date, therefore was classi-
fied as a "younger person" under the regulations, and was 47
years old at the time of the hearing.  (Tr. 22, 61, 465); 20
C.F.R. §404.1523(c).  She is married with two children, ages 22
and 11, but neither live with her.  (Tr. 61-62, 465-66)  She
stands 5'7", weighs approximately 222 pounds, smokes approxi-
mately 1-1/2 packs of cigarettes each day for over 28 years, and
completed high school. (Tr. 98, 104-05, 149, 162)  Bryant's past
relevant work includes jobs as retail cashier, manicurist, and
cafeteria worker, as well as work that the Vocational Expert's
Work History Report classified as product assembler.  (Tr. 22,
67-73, 99, 106-113, 468-471, 493)  Bryant has not worked since

October 31, 2007.  (Tr. 60, 466)  Bryant is insured for the

purposes of DIB through at least March 31, 2009.  (Tr. 59)

In the Disability Reports submitted upon her application for benefits, Bryant indicated that "[n]eck and back problems and right leg" were the conditions limiting her ability to work by limiting her ability to lift more than 10 pounds and causing her trouble walking, sitting, sleeping, migraine headaches, chronic pain, blurred to loss of vision, and that she "may have MS or blood clot or blocked artery."  (Tr. 98)  Her handwritten application forms include complaints of pain in arms and legs, trouble walking and standing, knee pain, leg pain, chest pain, neck pain, foot pain, "back nerve pain", trouble breathing, trouble sleeping, "trouble holding things & dropping them", trouble looking up or down, "fibro-myopathy", weakness on her right side, pinched nerve, heal spur, inability to "get foot to lay flat", degenerative joint disease, muscle spasms, accelerated heart beat while sleeping, throwing up, diarrhea, stomach problems, an "infected ulcer in stomach", dizziness, inability to focus for reading, poor balance, and fatigue. (Tr. 75-94)

In January 2002, Bryant was evaluated by Dr. Stanley Friedler, M.D., an orthopedic surgeon, who ordered an MRI that revealed degenerative central herniation changes at C3-4.  He restricted her to lifting no weight over 30 pounds.  (Tr. 152) Bryant began to see another orthopedist, Dr. John Carbon, in March and April 2002, who gave her trigger point injections and facet nerve root blocks to try and relieve her right-sided myalgia, noting a history of post traumatic cervical facet joint

arthritis with associated cervicogenic headaches. (Tr. 136-38)
During her treatment, Bryant was off work and claimed to have
pain and muscle tightness, but Dr. Carbon released her on April
30, 2002, to work for only four hours per day with restrictions
to 20 pounds of lifting. (Tr. 138) Contrary to assertions in
Bryant's Opening Brief, on May 14, 2002, Dr. Carbon noted Bry-
ant's gait was *non*-antalgic for short distances. (Tr. 135) Dr.
Carbon's treatment plan on this date states that Bryant "is
stable and her work will be increased to eight hours per shift,
essentially returning to her normal duties at the warehouse[,]"
and that she "is comfortable with this and will be seen for
routine follow-up[.]" *Id.* On May 28, 2002, Bryant reported she
still was working full-time but had continued neck pain. She was
continued on Amitriptyline and Vioxx and scheduled for another
nerve root block. (Tr. 134) However, Dr. Carbon's treatment
plan states that "it does not appear that she will need therapeu-
tic exercise or physical therapy as she is currently working."
*Id.*

On January 21, 2003, Bryant had an Independent Medical
Evaluation with Dr. William Launder. (Tr. 149) The evaluation
indicates she reported being injured on her job on December 6,
2001. *Id.* Bryant reported she was sitting at a desk when she
was struck by an oncoming pallet jack resulting in injuries to
her neck, right shoulder, and arm. *Id.* Both cervical spine and
right shoulder x-rays at this examination were normal. (Tr. 150)
Dr. Launder's impressions state chronic cervical radiculopathy

4

and chronic tendonitis of the right shoulder. (Tr. 151) Dr. Launder concluded that Bryant "has reached maximum medical improvement" with total cervical impairment of 42%, a number which incorporates 12% cervical impairment by loss of motion, 10% impairment from her radiculopathy, and a 20% impairment from her reported pain, dysfunction and loss of endurance. *Id.* Her right shoulder impairment finding of 20% likewise resulted from a 4% impairment based on range of motion combined with a 20% impairment from reported pain, dysfunction, and loss of endurance. *Id*.

On February 3, 2003, Bryant underwent another orthopedic examination by Dr. Friedler, to whom Bryant reported she had been seen at the ER on January 30, 2003, after a sudden onset of pain in the grocery store. (Tr. 152-53) Upon examination, Bryant had tenderness and a restricted range of cervical motion, limited rotation and bending, and diminished grip strength. (Tr. 153-54) Exam of her lumbosacral spine evidenced flattening of the normal lodotic curve and mild spasm to palpation, no CVA tenderness, a limited range of motion upon flexion, extension and lateral bending, with sensation and motor strength intact. (Tr. 154) She had positive straight leg raising at 60 degrees. *Id*. Bryant was diagnosed with chronic cervical strain/sprain, degenerative disc C3-4, consider radiculopathy right, acute lumbrosacral strain/sprain, and consider disc herniation lumbar unrelated to her work injury. *Id*. Dr. Friedler indicated her complaints and treatment were consistent with her injury and suggested an EMG. (Tr. 154-55) On March 20, 2003, Bryant underwent an EMG which

was normal with no evidence of cervical raiculopathy, brachial plexus lesions, or thoracic outlet syndrome, no evidence of peripheral nerve injury or entrapment syndrome, and no evidence of generalized peripheral neuropathy.  (Tr. 156)

On June 27, 2004, Bryant visited the ER due to chest pain with dyspnea and nausea, double vision, and neck pain.  (Tr. 206-218)  She was kept overnight for observation, but her EKG and all lab results were normal save an elevated CK level of 798. She ultimately was found to show "no evidence of myocardial infarction".  (Tr. 207)  The following day, Bryant saw Dr. Frank Green at the Williamsport Cardiology Clinic for a consultation although her chest x-rays showed no active disease and all other tests revealed normal function.  (Tr. 347-352)

On June 30, 2004, Bryant visited the ER again due to continued chest pain interfering with her ability to work.  (Tr. 196) Bryant was transferred to the Heart Center of Indiana with complaints of chest pain, shortness of breath, nausea, and dizziness on the same day.  (Tr. 161)  Bruce Rosen, a nurse practitioner, lists atypical chest pain in a patient with multiple cardiac risk factors, hypertension, hyperlipidemia, possible vertiginous dizziness, chronic sinusitis, tobacco abuse, and mild hyperglycemia in his impressions.  (Tr. 163)  Her chest x-ray was normal. (Tr. 169)  Her cardiac MRI showed normal functioning of both the right and left ventricular systolic function with mild aortic insufficiency.  (Tr. 170)  One of two EKGs evidenced sinus bradycardia, but states her results are "otherwise normal," while

6

the second is simply normal.  (Tr. 171-72)

On August 31, 2004, Bryant visited Dr. Peter J. Torok, M.D., at the St. Vincent Clinic due to knee and neck pain.  (Tr. 255) Upon examination, tenderness of the right musculature was noted in addition to right shoulder pain reproduced by neck motion. *Id*.  She was diagnosed with right knee pain of an intermittent nature and worker's comp neck injury.  (Tr. 256)  She was instructed to continue with anti-inflammatories and stretching exercises. *Id.*  X-rays of the cervical spine and right knee dated August 31, 2004, were negative.  (Tr. 195)  This was Bryant's last record of treatment before her alleged onset date of September 17, 2004.

On November 9, 2004, Bryant returned to Dr. Fischer.  (Tr. 251)  She reported she had problems with her knee, but that the "ortho said nothing wrong." *Id.*  She complained of bad headaches and it felt like the whole right side of her head was "going to explode." *Id.*  She complained that she had trouble using her right arm and leg. *Id.*  Her blood pressure was 152/90. *Id.*  The doctor diagnosed her with headaches, hypertension, and anxiety. *Id.*

On December 1, 2004, Bryant visited Dr. Hamid S. Hamdi, M.D., for a neurological consultation.  (Tr. 231-32, 253)  She reported she started having headaches after her work injury in June 2001 which interfered with the ability to carry out routine activities. *Id.*  Dr. Hamdi's impressions of Bryant were migraine headaches and myofascial pain of the neck.  (Tr. 232, 254)  Dr.

7

Hamdi's recommendations included her continuation of Motrin use as prophylaxis "as this seems to be relieving her headache fairly well", and an MRI. (Tr. 232) An MRI of the brain dated December 4, 2004, showed multiple nonspecific punctuate hyperintense foci, noted to involve the periventricular and subcortical white matter. (Tr. 193) Differential included small foci of gliosis, demyelination, or sequelae of small vessel ischemic changes. *Id.*

A few days later, on December 9, 2004, Bryant visited the ER at St. Vincent complaining of left side rib pain for four days. (Tr. 187) She was diagnosed with noncardiac chest pain, with the notes indicating Bryant stated she is "prone to pneumonia." (Tr. 187-88) An EKG that day showed "normal sinus rhythm" and "minimal voltage criteria for left ventricular hypertrophy may be normal, variant." (Tr. 192)

On January 5, 2005, Bryant visited Dr. Hamdi for migraine headaches, and he noted she was unable to fill her prescription of Pamelor for financial reasons and stopped taking Celebrex due to the new FDA advisory. (Tr. 228-29) Bryant reported she had three headaches per week and severe pain in her right leg that made all movements difficult. (Tr. 228) Her blood pressure was 142/90. *Id.* The doctor noted she seemed to be in significant distress from the pain and had difficulty in movement of the right leg. *Id.* Physical examination revealed right ankle dorsiflexion weakness, give away type at 3/5. *Id.* Her gait was antalgic. *Id.* Dr. Hamdi diagnosed Bryant with right L5 radiculopathy, right arm pain myofascial in origin, and migraine

headaches.  (Tr. 228-29, 339)  He again recommended she use the prescribed Pamelor.

On January 6, 2005, Bryant visited the ER at St. Vincent for chest pain and increased blood pressure.  (Tr. 181)  She indicated that she was not taking all the medications she was prescribed because she could not afford to fill them.  *Id.*  She was diagnosed with noncardiac chest pain and epigastric pain.  (Tr. 182)  An MRI of the lumbar spine dated January 8, 2005, revealed *mild* disc dessication at L5-S1 with left S1 root compression due to medially projecting facet spur encroaching the left subarticular recess at L5-S1.[1]  (Tr. 180, 336)  A cervical MRI showed

---

[1]Bryant's Opening Brief left out the word "mild" from this finding, as well as many other findings.  This serves as an excellent example of plaintiff's counsel picking and choosing particular words and phrases from the record to portray in his brief quite a different view of the facts than a *de novo* review of the record reveals.  This record's Findings in their entirety state:

> At L5-S1, there is mild disc desiccation with no loss of disc height.  Endplates are normal.  Small, medially projecting facet spur causes left subarticular recess encroachment and left S1 root impingement.  Central canal size is normal.  The right subarticular recess is normal.  Foramina appear satisfactory bilaterally.
>
> At L4-5, disc morphology and canal size are normal.  Facets and facets are normal.  There is no protrusion or extrusion and no annular tear.
>
> At the L3-4 level, disc morphology and canal size are normal.  There is no protrusion or extrusion.
>
> The L2-3 level is normal.
>
> L1-2 appears normal.
>
> Lumbar vertebral body bone marrow signal is normal.  Alignment is normal.  Pedicles, facets and neural arches are intact.  Conus and cauda are normal.
> (Tr. 180)

trace spondylosis at C3-4 with canal size normal and facets and foramina normal. (Tr. 235) The cervical results from this report were found as normal. *Id.*

On January 20, 2005, Dr. Fischer wrote a note indicating "Patricia Ray has multiple medical problems. She is unable to work until cleared by her specialists." (Tr. 248) The note and another like it in the record include no medically relevant or specific information. (Tr. 246, 248)

On January 26, 2005, Bryant returned to Dr. Hamdi for right arm pain, myofascial type, right leg pain, suspicion of L5 radiculopathy, migraine headaches, hypertension, hyperlipidemia, and complications from her work injury in June 2001. (Tr. 226-27) She stated she had a recent loss of peripheral vision for the third time with severe dizziness. *Id.* She also reported she had right leg pain in the hip, knee, and dorsum of the right foot, which made walking very difficult. *Id.* Bryant indicated she experienced pain from the neck radiating to the right arm. *Id.* Her blood pressure was 148/110. *Id.* Dr. Hamdi noted her gait was antalgic. *Id.* He diagnosed Bryant with transient loss of vision with severe dizziness. (Tr. 227) He ordered an MR angiogram of the vertebral basilar system and a 2D echocardiogram, and he prescribed aspirin and Plavix. *Id.*

The MR angiogram performed on February 2, 2005 was normal. (Tr. 234) An echocardiogram that same day revealed low normal left ventricular systolic function with trace to mild mitral regurgitation, with no intracardiac source for systemic emboliza-

tion detected. (Tr. 332) Several days later, on February 7, 2005, Bryant returned to Dr. Fischer. (Tr. 247) Her blood pressure was 150/102. *Id.* The doctor's mostly illegible chart mentions migraines and depression, but it is extremely difficult to read. *Id.* The next day, on February 8, 2005, Bryant returned to the ER at St. Vincent with a severe headache. (Tr. 175A) The triage notes indicate Bryant stated she would kill herself or die if the headache did not get better. *Id.* Bryant reported her recent visits with Drs. Hamdi and Fischer and noted she did not have any money to fill prescriptions. Dr. Fischer gave her samples of Lipitor and Atenolol. (Tr. 176) On February 9, 2005, Dr. Hamdi diagnosed Bryant with migraine headaches with a strong neuralgic component from the occipital nerve. (Tr. 331) He also diagnosed her with multiple other chronic pain problems, both myofascial and "some of it" arthritic in nature, and prescribed Neurontin. *Id.*

On February 16, 2005, Dr. Fischer completed a Loan Discharge Application: Total and Permanent Disability. (Tr. 262) He indicated Bryant suffered from hypertension, degenerative joint disease, depression, syncope, and arterial sclerotic cardiac vascular disease. *Id.* The doctor reported that her medical conditions began on August 24, 2004 and prevented her from being able to work or earn money in any capacity. *Id.* On February 17, 2005, Bryant returned to visit Dr. Fischer for a refill of Neurontin. (Tr. 440)

On February 22, 2005, Dr. H. Lowallo, a state agency review-ing doctor, completed a Physical RFC indicating that Bryant could lift and/or carry 20 pounds occasionally and 10 pounds fre-quently, that she could stand and/or walk for a total of about six hours in an eight-hour workday, and that she could sit for a total of about six hours in an eight-hour workday. (Tr. 238) The review indicated that she occasionally could climb, balance, stoop, kneel, crouch, and crawl. (Tr. 239) Dr. Lowallo con-cluded that Bryant was capable of light work with occasional postural limitations. (Tr. 237-244) Dr. A. Dobson, another state agency reviewing physician, concurred with Dr. Lowallo's findings in June 2005. (Tr. 244)

On March 9, 2005, Bryant returned to Dr. Hamdi for frequent intractable common migraines, right L5 radiculopathy, history of syncope hypertension, hyperlipidemia, and complications stemming from a work-related injury in June 2001. (Tr. 223-24) Bryant reported that she continued to have daily headaches with neck tension, neck pain which included aching, sharp shooting pain from the right base to the top of the head. *Id.* She stated that it was severe enough to cause nausea. *Id.* She also experienced loss of peripheral vision, blurriness of vision and flickering lights, vomiting, and dizziness. *Id.* Her gate was antalgic. *Id.* The doctor diagnosed her with cervicalgia, right greater occipital neuralgia, and common migraine with frequent occurrence and causing severe disability, and peripheral vestibulopathy. (Tr. 224) Dr. Hamdi increased her Neurontin and added Meclizine.

*Id.* He indicated that he was quite limited in the ability to prescribe medications because Bryant did not have prescription coverage. *Id.*

On March 16, 2005, Bryant had a computerized video ENG. (Tr. 233) It evidenced left beating nystagmus present during left Dix-Hallpike and slight left beating nystagmus in head left, and left lateral positions, but it listed nothing in the section for physician interpretation and stated she has no significant unilateral weakness or directional preponderance. *Id.* On April 12, 2005, Bryant visited the Arnett Clinic. (Tr. 221) She reported she had pain across the lower back radiating down to her right foot, and pain in the neck that occasionally radiated to the right arm. *Id.* She rated the pain at a nine on a ten point scale. *Id.* She also reported that cervical injections and chiropractic treatment did not help, and that recent physical therapy for her lower back pain aggravated the pain significantly.[2] *Id.* The record from this visit does not include any impressions or recommendations or conclusions. The next day, Bryant returned to visit Dr. Hamdi. (Tr. 219) The doctor recommended she should to go to Lafayette Rehab for treatment, but she indicated she could not for financial reasons. (Tr. 220) Dr. Hamdi increased her Neurontin and advised her on home exercises. *Id.* On April 28, 2005, Bryant visited Dr. Fischer complaining of "having stomach pains" that were "not always in

---

[2]The court sees no record of chiropractic treatments or physical therapy in the record.

13

the same place." (Tr. 438)

In June 2005, Bryant complained of ongoing chest discomfort and a feeling that her heart was racing. (Tr. 326) Dr. Fischer reported that a cardiac exam was unremarkable and noted that her symptoms did not appear to be cardiac related because testing for cardiac abnormalities in the past had proved to be normal. *Id.*

On July 12, 2005, Bryant returned to Dr. Fischer for migraine headaches that last for five days with numbness of the right arm, shortness of breath, chest racing, right leg and knee pain, numbness on top of toes on right foot, stomach pain, and diarrhea. (Tr. 437) Bryant also reported she could not stand for longer than four hours. *Id.* On July 25, 2005, Bryant visited the Williamsport Cardiology Clinic. (Tr. 326) She reported that her chest discomfort was constant and never went away. *Id.* She described it as "heaviness" and that at times it felt like her heart was "pounding out of her chest." *Id.* The physical examination performed notes that her cardiac exam was "unremarkable." *Id.* An ECG performed was normal. (Tr. 327) The next day, on July 26, 2005, Dr. Fischer's notes indicate that a left foot x-ray dated July 25, 2005, evidenced mild degenerative joint disease of the first MP joint. (Tr. 437) He noted a left heel x-ray evidenced a right calcaneal spur, although again, Dr. Fischer's notes are practically illegible and there are no other radiology reports to support these scrawled notations. *Id.*
 A Holter ECG Report dated July 27, 2005, showed supraventricular ectopy consisting of rare PACS and ventricular ectopy consisting

of rare PVCs.  (Tr. 322)  On July 29, 2005, Bryant saw Dr. Ter-
rance Devlin for an examination of her right foot and knee.  (Tr.
321)  The doctor diagnosed her with plantar fasciitis and proba-
bly chronic internal derangement of the right knee.  *Id.*  He gave
her a heel cup to use for 3-4 weeks and ordered an MRI.  *Id.*  An
MRI of the right knee dated August 3, 2005, evidenced a tear of
the anterior cruciate ligament, and edema within the anterior
portion of the intercondylar imminence of the tibia, likely
related.  (Tr. 319-20)  Dr. Devlin noted that x-rays of Bryant's
feet and knee were unremarkable and that her ankle range of
motion was unremarkable, that the anterior tibial examination was
unremarkable, and that she had full extension and flexion in her
right knee.  (Tr. 321)

On August 4, 2005, Bryant returned to Dr. Hamdi.  (Tr. 316)
She reported trouble walking, was being wheeled around in a
wheelchair, had started dropping things, and reported excessive
daytime fatigue as well as worsening of her headaches with vision
problems.  *Id.*  She noted she was trying to quit smoking and
decreased the number of cigarettes she smoked per day.  *Id.*  The
doctor noted that Bryant was morbidly obese.  (Tr. 317)  He also
noted that her gait was antalgic and that she did not bear weight
on her right heel secondary to a calcaneal spur.  *Id.*  He diag-
nosed her with fibromyalgia with the typical palpable trigger
points all over her body, fatigue and depression.  He also pre-
scribed Elavil and physical therapy.  *Id.*  On August 11, 2005,
Dr. Fischer issued a note stating Dr. Hamdi diagnosed Bryant with

15

frequent infractory common migraines, right L5 radicular symptoms, and recurrent syncope. (Tr. 246) Dr. Hamdi recommended she take an anti-depressant, decrease her consumption of tobacco and caffiene, and undergo physical therapy. *Id.*

On August 26, 2005, Bryant returned to Dr. Devlin who noted Bryant had an anterior cruciate deficient knee and discussed surgical and bracing options with her, but Bryant did not have insurance so her options were limited. (Tr. 315) On August 31, 2005, Bryant returned to Dr. Hamdi who noted that she could hardly walk or do anything. (Tr. 310) The doctor diagnosed her with fibromyalgia with multiple pain problems including migraine, truncal myofascial pain, and extremity pain. (Tr. 311) Complicating these conditions was her lack of insurance. *Id.* Dr. Hamdi increased Bryant's Elavil. *Id.*

On September 2, 2005, Bryant visited Dr. Nicholas Costidakis, DPM, at the St. Vincent Clinic. He noted pain upon palpitation of her heel and diagnosed plantar fasciitis and strapped her foot. (Tr. 309) On September 16, 2005, Bryant returned to Dr. Costidakis for heel pain following removal of the strapping. Because she could not afford prescription orthotics, Bryant was given nonprescription ones. (Tr. 308) On November 17, 2005, Bryant visited Dr. Fischer and complained of diarrhea and fibromyalgia symptoms. (Tr. 435) On December 8, 2005, Bryant returned to Dr. Hamdi, who noted that she was using a wheelchair due to pain. (Tr. 302) Her blood pressure was 150/100, and she had an antalgic gait. (Tr. 303) He suspected bilateral carpal

tunnel syndrome, but she could not afford further diagnostic tests, an EMG and NCV. *Id.* He placed her on Elavil, Effexor, Ultram, and Meclinzine. (Tr. 303-307) On December 13, 2005, Bryant again visited Dr. Fischer and complained about a persistent upper respiratory infection, persistent bronchitis, fibromyalgia, and nicotine addiction. (Tr. 434)

On January 31, 2006, Bryant returned to Dr. Fischer complaining of headaches, neck pain, back pain, and stomach pain. (Tr. 433) Physical examination found moderate to severe right upper quadrant tenderness of the abdomen, and the doctor noted Bryant dragged her right leg and used a cane. *Id.* On February 13, 2006, Bryant reported abdominal pain, was noted to have tenderness and was referred for an ultrasound. It was performed on February 16, 2006, and revealed a fatty liver with some mild enlargement. (Tr. 298-99) The next day, Bryant returned to Dr. Hamdi complaining of a significant amount of distress with easily aggravated pain, numbness spreading, and black spots in her vision. (Tr. 295) The doctor's impressions were of neck pain, headache, and numbness of the trunk secondary to anxiety. (Tr. 296) She was prescribed Effexor and Zanaflex. (Tr. 296) On March 20, 2006, Bryant visited Dr. Gerritt Smith, M.D., for ongoing upper abdominal pain. Dr. Smith referred Bryant for an upper gastrointestinal ("GI") endoscopy after her physical exam

revealed that she was "a little tender in the right upper quadrant" but otherwise unremarkable. (Tr. 293)

On June 12, 2006, Bryant saw Dr. Fischer, who found her to have a flat affect and epigastric right upper quadrant tenderness. (Tr. 421) Bryant was diagnosed with chest wall pain, anxiety disorder, vertigo, and pain. *Id.* On June 28, 2006, she reported to Dr. Hamdi continuing progressive symptoms now that seemed to engulf her entire body, fluctuating headaches that occurred three times a week and lasted almost an entire day with light and noise sensitivity, tingling sensation in her legs when active, tingling in the left forearm and little finger with locking of her left arm, and multiple joint pain and stiffness making walking difficult. (Tr. 288) He noted that her symptoms included fatigue, daytime somnolence, headache, dizziness, vision changes, runny nose, cough and shortness of breath on walking, chest pain, palpitations, nausea, memory loss, numbness, generalized weakness, insomnia, depression, and anxiety. (Tr. 288–89) She was diagnosed with myofascial pain syndrome. *Id.* He indicated Bryant did not meet the criteria for fibromyalgia with eight out of 18 trigger points. *Id.* On July 10, 2006, Dr. Fischer noted mild upper quadrant tenderness with chest pain, anxiety, vertigo, and weakness. (Tr. 417) The doctor also referred her to social services to get a wheelchair and issued a note restricting Bryant's travel. *Id.*

On February 22, 2007, Bryant underwent a consultative examination by Dr. Dave Coleman, Ph.D. at the request of vocational rehabilitation services. (Tr. 379-384) Dr. Coleman performed a mental health status interview and a WAIT-II test, which re-

vealed: a Verbal IQ of 86, Performance IQ of 105, and Full Scale IQ of 94; 2nd grade level oral expression and 7th grade level reading comprehension; a learning disability; and mild depression with sleeplessness, anxiety, and racing thoughts. (Tr. 379-382) Dr. Coleman noted that Bryant had completed three years of business courses at college and worked in several jobs requiring office skills. (Tr. 383) Dr. Coleman found signs of bipolar disorder, stating that these symptoms would impede her ability to concentrate, to recall facts and job requirements, and to stay on task. (Tr. 383)

On April 3, 2007, Dr. Fischer treated Bryant for an upper respiratory infection, fibromyalgia with diffuse pain, and nicotine addiction. (Tr. 413) On June 26, 2007, Dr. Fischer saw her for complaints of excessive perspiration, the recently diagnosed bipolar disorder, hypertension, and nicotine addiction. (Tr. 399) On August 6, 2007, Bryant saw Dr. Fischer for a follow-up. (Tr. 398) On August 16, 2007, Bryant visited Dr. Richard T. Gripe complaining of neck and right knee pain, and he found upon physical examination that she "has good flexion and extension and she can turn well to the left but she has great difficulty turning to the right." (Tr. 271) Dr. Gripe did not detect any sensory abnormality around her neck. *Id.* He found her to have full motion and good strength in her knees. (Tr. 272) X-rays of the cervical spine showed an old, possibly unrecognized, fracture of the cervical vertebra C3. *Id.* Dr. Gripe put Bryant in a cervical collar and issued work restrictions of light duty with a

five pound lifting restriction, and he scheduled her for an MRI. (Tr. 272-73)

An MRI of the cervical spine dated August 20, 2007, evidenced multilevel disc degeneration, uncoverteral process hypertrophy, and left worse than right foraminal stenosis. (Tr. 265) An MRI of the right knee, also taken that day, evidenced a possible small free edge tear of the medial meniscus, severe ganglion cysts, transformation of the anterior cruciate ligament, and mild to moderate degenerative cartilage changes of the patefemoral compartment. (Tr. 268-69) On August 23, 2007, Bryant returned to Dr. Gripe for pain in her right knee and for the review of her MRI. (Tr. 264) Upon physical examination, the doctor noted her knee lacked full extension, but he noted that she had full range of motion and good strength. *Id.*

On September 21, 2007, Bryant saw Dr. Fischer due to lower back pain at a level of nine out of ten. (Tr. 390) She reported every joint in her body hurt and that she has trouble sleeping, walking, and using her arms. *Id.* Physical examination revealed tenderness over the cervical and thoracic spine to palpation as well as over the elbow and knees. *Id.* He noted the right knee had quite a bit of degenerative arthritic changes, and she was scheduled to have right knee surgery in the future and told to use a knee brace. *Id.* Bryant was diagnosed with dyslipidemia,

degenerative arthritis of the knees with pain, insomnia, and diffuse arthritis. *Id.*

On September 24, 2007, Bryant went to the ER due to chest pain and anxiety. (Tr. 368) Her blood pressure was 201/111. *Id.* She reported she had an anxiety attack after having numbness, headaches, and chest pain. *Id.* She was given IV Toradol and Nubain with marked relief. *Id.* Bryant was diagnosed with chest pain, most likely caused by anxiety after her physical and neurological examinations at the hospital were normal. *Id.* She was released from the hospital and told that she could return to work without restriction the next day. (Tr. 359, 368)

On September 26, 2007, Bryant returned to the ER with dizziness, passing out, and "funny" back and neck pain. (Tr. 358) She was diagnosed with a syncopal episode and referred to a neurologist. Again, she was told to return to work with no restrictions. (Tr. 358-59) Bryant was seen at the ER on October 20, 2007 due to a second syncope. (Tr. 356) She was instructed not to drive until medically cleared by her neurologist and treating physician. However, she also was released to return to work with no restrictions. (Tr. 355, 376) MRIs in October of 2007 revealed evidence of migraine effects. (Tr. 441-42)

At her video conference hearing before the ALJ on November 5, 2007, Bryant testified that although she had a driver's license, she had been "told [she could] no longer drive." (Tr. 466) She stated that she had an income up until October 31, 2007, five days prior to the hearing, when she ceased working as a housekeeper at a rehab center, stating that "Dr. Fisher requested [her] to stop working." (Tr. 466-67) She had been

working since March 2007, four days a week, seven and a half
hours a day.  (Tr. 466)  Her duties included "[m]opping floors,
cleaning beds, walls, bathrooms, sinks," as well as lifting or
moving furniture to clean, but she stated that she did not do a
lot of lifting because she "got out of the lifting part."  (Tr.
472-73)  When questioned about her work history, Bryant discussed
her work history as a cashier at an IGA store, in a public school
cafeteria, in a distribution and warehouse center, a truck
driver, a hotel receptionist, a cashier at a drug store, an
accounts receivable clerk, and a manicurist or nail technician.
(Tr. 468-69)  Bryant apologized because her "head hurts really
bad."[3]  (Tr. 470)  Her longest employment in the last 15 years
was as a "nail tech" from 1993-95 at Hair Raising Experience.
(Tr. 471)

Regarding her medical treatment, Bryant testified that she
currently received prescriptions for Toprol, Celebrex, Crestor,
Lexapro, Hydrocodones and Flexeril when absolutely necessary.
(Tr. 471, 481)  When questioned about her daily activities,
Bryant testified that she and her husband of one year lived in
the house that he owned and that she did "easy cooking, you know,
you heat it up in the microwave."  (Tr. 471-473)  She also read,
listened to the radio, did light cleaning, and went grocery

---

[3]Counsel's description in the Opening Brief that Bryant "appeared
confused" is interesting since he was not the same counsel that appeared at
the hearing and the record is a transcript.  Again, the liberties taken by
Bryant's counsel in presenting the facts in his brief do not aid the court in
making a full review of the record to see the facts as presented.  However,
the irony of cherry-picking and embellishing facts while making an argument
about a credibility determination of the ALJ is noteworthy.

shopping with her husband every week. (Tr. 473-74) Bryant
testified that she left the house four or five times weekly and
drove a minivan around town, but she stated that she did not go
"too far out of town because I never know if I'll have an epi-
sode[.]"[4] (Tr. 475) Regarding her ability to sit, stand, and
walk, Bryant estimated that she sat for four or five hours total
between 2:30 am to 8:00 pm. (Tr. 476) During that same time,
she estimated that she spent "probably three or four hours" on
her feet, and "three or four hours a day" lying down. *Id.*
Bryant told of her "little puppy" that she had to let out regu-
larly. (Tr. 476) She stated that she probably drove 15 miles a
day on work days. (Tr. 476) Bryant testified at great length
about her many complaints of pain and ailments, as well as the
variety of doctors and tests evidence in her record. (Tr. 479-
483) Bryant testified that her condition had been ongoing for
the past three years and had deteriorated over the prior six
months. (Tr. 481) Bryant had difficulty grasping objects,
walking, and suffered from "unbearable" pain. *Id.* She stated
that her parents, who lived across the street, and husband called
her every two hours "to make sure [she is] okay during the day so
that nobody has to call the ambulance." (Tr. 482)

Upon questioning from her attorney, Bryant further testified
that out of 30 days, four to five would be good days, and at

---

[4]Bryant's brief incorrectly states that she testified that she "cannot
drive alone, fearing 'an episode.'" However, her statement was not that broad.

least seven or eight, but up to ten, would be bad days. (Tr. 490) The remaining days would be average and conform to her prior description of her daily activities. *Id.* On bad days, Bryant stated that the headaches and the dizzy spells made it so she could barely stand up before falling, requiring her "to crawl to the bathroom." *Id.* She testified that her headaches caused vision problems. (Tr. 489)

Bryant testified that she ceased working in 2004 after she collapsed at work and applied for disability in January 2005 because she still had medical problems. (Tr. 484-85) However, she returned to work in March 2007, because she "didn't have no [sic] income and [she] couldn't get any more, [she] couldn't get any help." (Tr. 485) At the time, she was not married to her husband, yet he was "footing the bills for everything," so she "tried to go back to work to see if [she] could take the load off him." *Id.* Bryant testified that work was a "struggle" and that she would "come home and have to lay down because of the pain was so bad [she] would just cry all night." *Id.* After work demands increased, Bryant testified that she dropped things and experienced dizziness and blackouts. (Tr. 486) She missed four to five days of work in October 2007 due to her condition, and three days the prior month. (Tr. 491) Bryant's condition prompted her doctor to instruct her to quit working. (Tr. 486) Bryant also testified that she could not return to her prior work as a nail technician because fibromyalgia caused pain in her hands making it impossible to "hold the client's hand and . . . file and cut

for long [sic], for eight hours a day." (Tr. 487) She further testified that she could not return to her work as a cashier because of the lifting involved. *Id.* She testified that Dr. Gripe placed her on a five pound lifting restriction and that Dr. Fischer referred her to Social Services to get a wheelchair. (Tr. 488)

Dr. James Lanier appeared and testified at the hearing as the VE in addition to submitting a past relevant work summary. (Tr. 106-113, 493-496) In response to the ALJ's first hypothetical, for an individual of Bryant's age, education, and work experience who was limited to light work with no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling, the VE testified that the individual could perform Bryant's past relevant work as a retail cashier, hotel clerk, product assembler, and a manicurist. (Tr. 494) The ALJ further limited the hypothetical individual to sedentary work with occasional postural limitations and no more than frequent reaching, handling, or fingering, and no concentrated exposure to hazards. The VE stated those limitations would exclude all of Bryant's prior work, but she could work as a surveillance system monitor (DOT# 379.367-010; 5,400 jobs), lens glass assembler (DOT# 713.687-018; 5,000 jobs), and eyeglass polisher (DOT# 713.684-038; 5,810 jobs). (Tr. 495) He also noted that his

testimony was consistent with the information in the Dictionary of Occupational Titles. *Id.*

Upon questioning by counsel, the VE testified that the minimum productivity standards for the sedentary jobs he listed was 90% and that the person could not have over two unexcused absences per month. (Tr. 496) Also, the VE testified that further limitations to only occasional reaching, handling or fingering would eliminate all of the jobs. *Id.*

In his decision, the ALJ found Bryant to have severe degenerative disc and joint disease, headache, and chest discomfort, but disagreed with Bryant's contention that her learning disability, fibromyalgia, and carpal tunnel were severe. (Tr. 18-19) The ALJ noted that those non-severe impairments, however, were accounted for in the limitations in the RFC assessment applied. (Tr. 19) The ALJ then found that Bryant's severe impairments did not meet or equal a Listing "even considering [Bryant's] obesity", explaining that she lacked the necessary elements of Listing 1.04. (Tr. 19) The ALJ found that Bryant's allegations of the limiting effect of her impairments were "not entirely credible," citing Bryant's clinical and laboratory diagnostics, conservative medical treatment, daily activities, and work history. (Tr. 19-21) The ALJ discussed the objective medical evidence and the appropriate elements in his credibility assessment, concluding that the evidence in the record did not support the alleged intensity, persistence, and limiting effects of her symptoms. (Tr. 20) The ALJ specifically noted that Bryant gave different reasons for submitting her claim and for quitting her housekeeping job - back and neck pain versus headaches and chest

discomfort.  (Tr. 20)  The ALJ discussed at great length the evidence in the record that conflicted with Bryant's testimony, whether about her medical ailments or the level of her activities.  *Id.*

The ALJ then determined Bryant to have an RFC for "light work except she may occasionally climb, balance, stoop, kneel, crouch, and crawl."  (Tr. 19)  Based on VE testimony, the ALJ found Bryant could perform her past relevant work of retail cashier, product assembler, and manicurist.  (Tr. 22)  The ALJ noted that even if Bryant was limited to sedentary work, there still would exist a significant number of other jobs, such as an eyeglass frame polisher, surveillance system monitor, and lens glass assembler.  (Tr. 22-23)

Bryant maintains that the ALJ's decision is not based upon substantial evidence and that he committed numerous mistakes of law and fact, meriting reverse or remand.  Bryant argues that: 1) the ALJ failed to determine properly whether Bryant met a Listing; 2) the ALJ failed in his responsibility to build a logical bridge between the evidence and his conclusions; 3) the ALJ made an erroneous determination that Bryant was not credible; 4) the ALJ's hypotheticals were incomplete resulting in erroneous Steps Four and Five determinations.

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings

are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Secu-

rity regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520, §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b). If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national

economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f),

§416.920(f).

In her first argument, Bryant contends that the ALJ erred in

failing to determine that she met Listing 1.04.  When an ALJ

fails to cite any listed impairment and provides only a perfunc-

tory analysis, there is little basis for meaningful judicial

review and remand therefore may be required.  *Brindisi v. Barn-*

*hart*, 315 F.3d 783, 785-86 (7th Cir. 2003).  Here, the ALJ did

cite the specific listing in question.  Listing 1.04A states:

> Evidence of nerve root compression character-
> ized by neuro-anatomic distribution of pain,
> limitation of motion of the spine, motor loss
> (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of
> the lower back, positive straight-leg raising
> test (sitting and supine)[.]
>
> 20 C.F.R. Part 404, Subpart P, Appendix 1,
> §1.04A

It is the claimant's burden to meet each of these criteria.

*Rice,* 384 F.3d at 369.  In order for an individual to be disabled

under a particular listing, her impairment must meet each dis-

tinct element within the listing.  *Id.*

In this case, Bryant has failed to demonstrate that her back

impairment met the elements of Listing 1.04, and the ALJ suffi-

ciently articulated exactly why.  *See Ribaudo v. Barnhart*, 458

F.3d 580, 584 (7th Cir. 2006)(remanding because of ALJ's failure

to mention the particular listing and evaluate the criteria for

that listing).  Here, the ALJ's decision states the precise list-

ing Bryant professed to meet and details all of the necessary

criteria for meeting that listing.  Irrespective of Bryant's
subjective representations of her ailments, there was substantial
evidence in the record to support the ALJ's conclusion that the
criteria for this listing were not met.  Bryant has failed to
carry her burden of demonstrating an impairment under Listing
1.04.

In her next contention that the ALJ ignored medical evidence
supporting her claim and failed to build a logical bridge, Bryant
makes a two-pronged attack on the ALJ's decision.  First, Bryant
argues that the ALJ improperly rejected the opinions of her
treating physicians, Dr. Fischer, Dr. Hamdi, and Dr. Gripe.  A
treating source's opinion is entitled to controlling weight if
the "opinion on the issue(s) of the nature and severity of [the
claimant's] impairment(s) is well-supported by medically accept-
able clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence" in the record.
20 C.F.R. §404.1527(d)(2).  *See also* SSR 96-2p (same); ***Schmidt v.
Astrue***, 496 F.3d 833, 842 (7th Cir. 2007)(same); ***Gudgel v. Barn-
hart***, 345 F.3d 467, 470 (7th Cir. 2003)(same).  Inconsistencies
in a treating physician's opinion, whether conflicting internally
or with other substantial evidence in the record, may justify
denying the opinion controlling weight.  20 C.F.R.
§404.1527(c)(2); ***Clifford v. Apfel***, 227 F.3d 863, 871 (7th Cir.
2000).  *See, e.g., **Schmidt,*** 496 F.3d at 842 ("An ALJ thus may
discount a treating physician's medical opinion if the opinion is
inconsistent with the opinion of a consulting physician or when

the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for re-editing or rejecting evidence of disability."); *Latkowski v. Barnhart*, 93 F'Appx. 963, 969 (7th Cir. 2004)(same).

With the second prong, Bryant argues that the ALJ improperly relied on the opinions of the state agency reviewing physicians. However, when the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it and rely on the state agency reviewing physicians. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, substantial evidence supports the ALJ's decision to give greater weight to the state agency physicians' opinions than to that of the treating physicians, Drs. Fischer, Hamdi, and Gripe. As the ALJ observed, the record contains scant objective evidence in support of the alleged severity of Bryant's self-reported symptoms and her purported accompanying pain and discomfort. For example, repeated tests, including MRIs, x-rays, EMGs, and EKGs, consistently indicated normal results and failed to corroborate the discomfort alleged by Bryant. Dr. Fischer's notes are so illegible and incomplete that it is difficult to tell if he was listing Bryant's complaints or drawing conclusions, but the record indicates the former is likely. The ALJ correctly noted in his decision that Dr. Fischer's desk-pad notes regarding Bryant's ability to work were conclusory. *See, e.g., Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)(affirming

an ALJ's decision not to give controlling weight to a treating physician that gave blanket opinions on a claimant's ability to work without elaborating on the basis for that opinion). The ALJ correctly stated that such a conslusory opinion is an issue reserved to the Commissioner.

The ALJ also discussed in his decision that the treating physicians' opinions were granted limited weight based on their inconsistency with the longitudinal record as a whole and that he gave limited weight to the state agency non-examining physicians as well. Substantial evidence exists to support the ALJ's finding of internal inconsistency and opinions based solely on subjective complaints, and his decision clearly built the necessary logical bridge to support his conclusion.

Bryant next argues that in considering her credibility, the ALJ failed to analyze adequately the factors provided by SSR 96-7p. She contends that the ALJ failed to recognize her inability to afford treatment and mistook this as a lack of credibility. The Commissioner contends that the ALJ's credibility determination is supported by substantial evidence and is specific in its reasoning.

In making a credibility determination, SSR 96-7p states that the ALJ must consider the record as a whole: objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR

96-7p.  If an allegation of pain is not supported by the medical
evidence and the claimant states that the inability to work is
due to significant pain, the ALJ must obtain detailed descrip-
tions of the claimant's daily activities by making specific
inquiries about the effects of the pain.  *Zurawski v. Halter*, 245
F.3d 881, 887 (7th Cir. 2001).

An ALJ is not required to give full credit to every state-
ment of pain made by the claimant or to find that a disability
exists each time a claimant states that she is unable to work.
*Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996).  However, SSR
96-7p provides that a claimant's statements regarding the inten-
sity or persistence of her symptoms "may not be disregarded
solely because they are not substantiated by objective medical
evidence."  SSR 96-7p at *6.  An ALJ's credibility determination
is entitled to substantial deference by a reviewing court and
will not be overturned unless the claimant can show that the
finding is "patently wrong."  *Prochaska v. Barnhart*, 454 F.3d
731, 738 (7th Cir. 2006)(*citing Carradine v. Barnhart*, 360 F.3d
751, 758 (7th Cir. 2004)).

In addition, factors to be considered by an ALJ evaluating a
claimant's complaint of pain include:

> (i) The individual's daily activities;
>
> (ii) The location, duration, frequency, and
> intensity of the individual's pain or other
> symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and
> side effects of any medication the individual

takes or has taken to alleviate pain or other
symptoms;

(v) Treatment, other than medication, the
individual received or has received for re-
lief of pain or other symptoms;

(vi) Any measures other than treatment the
individual uses or has used to relieve pain
or other symptoms (*e.g.,* lying flat on his or
her back, standing for 15 to 20 minutes every
hour, or sleeping on a board); and

(vii) Other factors concerning the individ-
ual's functional limitations and restrictions
due to pain or other symptoms.

20 C.F.R. §404.1529(c)(3); SSR 96-7p at *3

Here, Bryant consistently complained of pain in her neck,
back, head, knee, heel, arms, and chest.  In his decision, the
ALJ found that the intensity, persistence, or functionally
limiting effects of her pains were not substantiated by the
objective medical evidence, and he proceeded to evaluate her
subjective symptoms under SSR 96-7p.  He noted that she alleged
disability by reason of neck, back, and leg pain, yet she worked
through October 2007.  He noted that her stated reasons for
stopping her work were headaches, numbness, and dizziness – not
the same conditions she alleged disabled her.  He noted that her
treatment had been conservative, medication management and
physical therapy, and the record is replete with just such
recommendations from her treating physicians.  He noted that any
complaints of chest pain or back pain did not restrict her from
working as a housekeeper or working as a whole.  He noted that
the totality of the medical record did not support any claims

that her knee problem affected her ability to stand, walk, or sit in order to work.  He again noted the subjective nature of her headache pains.  The ALJ considered her daily activities at home, pointing out the inconsistency of her testimony about her ability to care for her own home with the fact that she had been working as a housekeeper until five days before the hearing.  He noted that her daily activities do not match the level of her subjective complaints of pain.  The ALJ again commented on the conservative treatment used to alleviate her pain when necessary.

Here, ALJ Gildea clearly and thoroughly analyzed Bryant's subjective claims of pain and discomfort under the applicable standard, SSR 96-7p.  The ALJ also was privy to Bryant's testimony in a way any court upon review cannot be.  Therefore, his conclusion as to Bryant's credibility cannot be called "patently wrong" and stands.

Bryant also contends that the ALJ unfairly found her incredible based upon her failure to follow a treatment plan, which she claims was impossible due to financial difficulties.  A claimant's failure to follow a treatment plan can decrease credibility when a claimant "does not have a good reason for the failure . . . of treatment."  Before the ALJ may draw inferences about the claimant's condition from a failure to comply, an ALJ first must discern from the claimant the reasons for non-compliance.  *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)(failure to comply due to inability to pay for treatment, for example, may be an acceptable reason for non-compliance).  However, in this case,

the ALJ did not find that she failed to follow a treatment plan -
such a notion never was mentioned in his decision.  Rather, a
conservative treatment plan, which the ALJ noted, was all that
ever was recommended to this claimant.  This argument is without
merit.

Bryant finally argues that the ALJ erred by giving incom-
plete hypotheticals to the VE and by mistakenly overlooking the
regulations concerning her past relevant work.  SSR 96-8p ex-
plains how an ALJ should assess a claimant's RFC at steps four
and five of the sequential evaluation.  In a section entitled,
"Narrative Discussion Requirements," SSR 96-8p specifically
spells out what is needed in the ALJ's RFC analysis. This section
of the Ruling provides:

> The RFC assessment must include a narrative
> discussion describing how the evidence sup-
> ports each conclusion, citing specific medi-
> cal facts (e.g., laboratory findings) and
> nonmedical evidence (e.g., daily activities,
> observations). In assessing RFC, the adjudi-
> cator must discuss the individual's ability
> to perform sustained work activities in an
> ordinary work setting on a regular and con-
> tinuing basis (i.e., 8 hours a day, for 5
> days a week, or an equivalent work schedule),
> and describe the maximum amount of each work-
> related activity the individual can perform
> based on the evidence available in the case
> record. The adjudicator must also explain how
> any material inconsistencies or ambiguities
> in the evidence in the case record were con-
> sidered and resolved. (footnote omitted)
>
> SSR 96-8p

Thus, as explained in this section of the Ruling, there is a
difference between what the ALJ must contemplate and what he must

articulate in his written decision. *See **Morphew v. Apfel***, 2000
WL 682661, *3 (S.D. Ind. Feb. 15, 2000) ("There is a distinction
here [in SSR 96-8p] between what the ALJ must consider and what
the ALJ must articulate in the written opinion."); ***Lawson v.
Apfel***, 2000 WL 683256, *2-4 (S.D. Ind. May 25, 2000) (ALJ who
restricted the claimant to medium work satisfied the requirements
of SSR 96-8p)("[SSR 96-8p] does not require an ALJ to discuss all
of a claimant's abilities on a function-by-function basis.
Rather, an ALJ must explain how the evidence supports his or her
conclusions about the claimant's limitations and must discuss the
claimant's ability to perform sustained work activities.").

This argument by Bryant also is without merit because Bryant
assumes in arguing that the ALJ was mistaken in his findings
prior to establishing her RFC and presenting the hypotheticals to
the VE. *See **Ehrhart v. Sec'y of Health & Human Svcs.***, 969 F.2d
534, 540 (7th Cir. 1992)("The hypothetical question posed by the
ALJ was proper because it reflected [the claimant's] impairments
to the extent that the ALJ found them supported by evidence in
the record."); ***Meridith v. Bowen***, 844 F.2d 650, 654 (7th Cir.
1987) ("All that is required is that the hypothetical question be
supported by the medical evidence in the record.").  Here, the
ALJ discussed in his decision the fact that Bryant was working
five days prior to the hearing.  Additionally, the hearing
transcript reveals that the ALJ asked specific questions about
the particular requirements of her past relevant work, the reach-
ing, handling, or fingering necessary, and the second hypotheti-

cal included these limitations and was supported by the medical evidence in the record.

Bryant argues that there was no basis for finding that she had prior work as a product assembler, but such a fact was demonstrated without question in both the VE's past relevant work summary as well as in Bryant's testimony about her previous work. Therefore, substantial evidence supports the ALJ's inclusion of product assembler in Bryant's past relevant work.

Bryant also argues that her prior work as a cashier and manicurist should be eliminated from consideration because they are semi-skilled positions which would be impossible for her to do because of her headaches, anxiety, and bipolar disorder. Again, the ALJ found Bryant to be of average intelligence and did not find her anxiety to be a disabling factor. Conspicuously, the assertion that bipolar disorder limits Bryant in any way never was mentioned at the hearing, nor does the record reflect any particular focus on that possible diagnosis.

As to the specific requirements of Bryant's past relevant work, she contends that the ALJ failed to address her capabilities. "To determine whether [a claimant] is physically capable of returning to her former work, the administrative law judge obviously must ascertain the demands of that work in relation to the claimant's present physical capacities – at least where[] there is evidence that the claimant's impairments are worse today than when she was working." *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984)(internal citations omitted). However,

the Past Relevant Work Summary prepared by the VE discussed in detail all of Bryant's past work and indicated no limitations in her performance of those duties. The ALJ's assessment of Bryant's past work was reasonable and supported by substantial evidence. *See **Bennet v. Massanari***, 2001 WL 1165515, *8 (S.D. Ind. Aug. 20, 2001)(finding that the ALJ properly ascertained the particular nature of the claimant's working day and considered the significant characteristics of her past work). Moreover, the fact that the ALJ did not simply state that Bryant was capable of her past relevant work and then fail to decide whether other jobs existed in the national economy which she could perform solidifies that ALJ's decision. *See **Smith v. Barnhart***, 388 F.3d 251, 252 (7th Cir. 2004)(explaining that upon concluding that a claimant could perform past relevant work of the generalized sedentary category without specifically determining her ability to do the necessary tasks of that prior work and then failing to go on to determine whether such work exists which the claimant can perform requires remand). The ALJ gave a second, more limited hypothetical question to the VE, resulting in sufficient job availability for Bryant.

As a final note, Bryant asserts that when, in his credibility determination, the ALJ stated that "her impairments have not completely kept her from working suggests that they would not prevent her other work activities moderated to meet her particular capabilities" he required some sort of "sympathetic employment." The court disagrees and reads this statement in context

40

of the credibility determination and in its plain meaning as the
Commissioner does:  referring to any necessary adjustments of
Bryant's capabilities as presented in her RFC.

_____

For the foregoing reasons, the ALJ's decision finding Bryant
is not disabled is supported by substantial evidence and is
**AFFIRMED.**  The plaintiff's motion for reversal and remand is
**DENIED.**

ENTERED this 30th day of April, 2010


s/ ANDREW P. RODOVICH
     United States Magistrate Judge